Our first case for argument is 23-2043 Wonderland v. Evenflo. Before we begin the argument time, I've asked that both counsel come forward. We have some questions about confidentiality. So I'd like both counsel, you can either stand where you are or come to the podium, your choice. I don't care. But both do the same thing. So either both come forward or both stay put. All right. What we want to understand is there is some material in the cross appeal that is highlighted and designated as confidential. And we have some questions about it. Some of it has to do with technical terms related to particular car seats, which are, by the way, throughout the briefs and throughout the lower court opinion, not marked as confidential. So it's very confusing to me why particular words would be marked as confidential in the cross appeal when they're otherwise used and not marked confidential elsewhere in the briefs. So whoever would like to speak to this, I'd like to know, because we want to ensure that we respect anything that truly needs to be confidential, but we're a little confused about some of the markings. Is this the name of the email? Is that the word that we're... No, you have tons of... I'll give you an example, because throughout... I think you'll agree with me, throughout the briefs in general, the word tubes appears, right? But suddenly in the cross appeal, it's marked as confidential, the word tubes, the isolated word tubes. Why? Why would that be marked as confidential? That's a great question, Your Honor. It probably should not have been. Okay. So I think that here's the deal. We're going to treat words like that as not confidential. If there is something that any of us say at any point, just kind of like wave your hand, stop us if you think we're crossing a line. We can delay posting this on the website if necessary. I don't think that we're going to trample on confidentiality. Now, with regard to the email, we have a rule here in this court that... How many words, Judge Flanagan? I think it's 15. You're only allowed to have 15 words marked as confidential. You can move for additional words, but you need to move. Did you do that in this case? I do not believe so, Your Honor. So how is it that you've marked the entire email stream confidential? That would exceed our 15-word limit. And how about this? Why don't you tell me, because I'm not going to treat that entire email as confidential, tell me what about that email in particular you would like to maintain. For example, the person's name or the email address. What about that email do you think is confidential? Because you've not been consistent with our rules. If you're only allowed 15 words, you agree the email is way more than 15 words, right? Yes, Your Honor. Okay, so tell me what about it is what you want us to be mindful of the sensitivity in. Like the future product, for example. Yes, so I believe that's like a 40-page email. That has probably been provided just for full context of the court. I believe, and you can correct me if I'm wrong, I believe only two pages of it are actually material to the issues on the motion for a new trial. So those would be the two pages. I don't know if the rest has to be maintained in the appendix at all. Are you saying those two pages are not confidential or we can treat them? I mean, for example, there are a few things we all know what we're talking about. Some critical sentences and what they mean and so forth. Those. I do believe those two pages would constitute confidential information. Yeah, but you don't get to do that. Under our rules, you can only have 15 words that are confidential absent a motion to the court and you didn't make a motion to the court. So I'm trying to figure out how to proceed. Why is it you think those two pages are confidential? What is it about those two pages? If you want to tell me, for example, our future products which have not yet resulted in commercially available products, should the information related to those should be confidential? I think that we can all agree to treat that as confidential even though it exceeds more than 15 words. But I don't think that every word in those emails is directed to future products. Some of it is directed to already existing products on the market. So why would that be confidential? The future products I do believe would be confidential. The overall thread is about product development and the product development processes that are employed by Evenflow. And that does represent some competitive information. But to be honest, I don't have the full context of the email memorized. If you want to take a minute and take a look at it, I'm okay with that. Can I direct your attention? Why don't you get the email, both of you, so you have a copy of it. We just want to make sure the argument is as productive as possible for us and for you. And we don't want to trample on your company's necessary confidentiality. Well, 3786, I think, contains the statements that are most relevant to the determination made in this case. Maybe it's just me, but I thought it was the email I'm talking about. That is correct. Okay, is that up for grabs? Can we talk about that? What's problematic? Why should that be? There is the discussion in that email of an existing product that is already on the market. There's also a discussion in some of these emails about future development. Can we agree that to the extent that the email is speaking to an existing product that is already commercially available, we can ask questions about that portion of the email? Absolutely, Your Honor. Okay. Do you agree? Yes, Your Honor. Yeah. Well, that's his information, right? So you can reveal whatever he wants to reveal. You don't care. We defer on that issue. So, all right. Okay, good. So that, I think, does that take care of it? I think. Is that okay? Okay, so I think that we're all on the same page. Thank you. And now we'll be able to start the argument and hopefully have a fruitful discussion. Thank you, Your Honors. Yep. Thank you. Okay, Mr. Hankel, please proceed when you're ready. Good morning, Your Honors. My name is Aaron Hankel. I'm counsel for Evenflow Company, Inc., in this matter. May it please the Court. This is an appeal involving a jury verdict of infringement on two patents. Counsel will admit that this case does not involve the densest technology or the most complicated products, but it does present some significant questions about vital safeguards that this Court and the Supreme Court have imposed on trial courts, namely the duty to resolve legitimate disputes over claim scope and to do so properly. The two patents that are at issue in this case are the 043 patent and the 951 patent. They both generally relate to car seats. There's so many issues here, so I'm going to have to cut in because the clock is running, and I've got just odds and ends that I'm just interested in. Juan, in terms of the bucket of accused products that the jury said were infringed, what portion of those were the 4-1 and what portion were the 3-1? And let's look at the 043 patent. For the 043 patent, the 4-1 products, frankly in the case, the 4-1 products, Your Honor, are the Every Fifth and Every Kid. Those are the brand names. One sold at Walmart, one sold at Target. They were found to infringe the 043 patent under the doctrine of equivalence. They were not found to infringe. Right. No, I understand that. I just want to know of the bucket of infringing products, what portion of those, the bucket of the products found to infringe the 043 patent, what portion of those were the 4-1 and which portion were the 3-1? So all accused products in the case were found to infringe the 043 patent under the doctrine of equivalence. There are two car seats that are 4-1, and there are three car seats that are so-called 3-1. Does that answer Your Honor's question? What we don't have in this case, let me see if I can help, what we don't have in this case is any sort of breakdown in either the information presented to the jurors or in the jury special verdict form that splits them up by 4-1 versus 3-1, right? In terms of damages, for example. So I guess what we're getting at is suppose we agree with you on, for example, the locking mechanism with regard to the 4-1 patent, all right? That issue doesn't apply to the 3-1 patent. So if we agree with you on that point, maybe we reverse the judgment on the 4-1. What procedurally do we do with the 043 patent in the case if that's the only issue we agree with you on on the 043 patent? See, we're trying to figure out there's so many different issues here, and if we agree with you on some but not all, what do we do with the case? That's a great question, Your Honor. That information exists. It was obviously used by the jury to calculate the number and the royalty because it is a per-unit royalty. I do not believe it's in the record, so I don't know how the court— Well, it's probably in the record, but you think it's not on appeal. It's not in the appendices on appeal. Correct. The damages issues were not appealed by either party. Because obviously it's of interest. Let's assume the 401 gets off the plate. If there were only two products in the damages calculation for the 4-1, that hardly makes a big difference. But you assume that we could calculate the damages because it's a different amount ascribed to the 4-1 and the 3-1, right? So we could backtrack, or you could backtrack the number. Yeah, I mean, I think in that situation, a remand to the trial court for an accounting on this issue is—I mean, it's a matter of basic math, and the information does exist. Another cats and dogs question. On the connected to limitation, that wasn't subject to— as I understand the record, and I couldn't find it, it seemed not to come up as a claim construction matter, but to come up as a jury instruction matter? So how—can you just quickly tell me how that came to be? Did the parties get to brief it? Did they put forth their own independent constructions of the connected to, or what? We did, Your Honor, and I can give you some specific citations. But the way that issue developed at the trial court stage was Edenflow moved for summary judgment. You know, under the plain and ordinary meaning of connected to, these two claim members must be separate devices. There's no dispute that the accused brought it. That's not the case. So the parties had agreed to plain and ordinary meaning? Yes. At the claim construction stage. Okay. Well, that's summary judgment, and that summary judgment motion was denied. At that time, the trial court decided it was a question of fact for the jury. It was during trial, after the close of Wonderland's case, when Edenflow started presenting its witnesses, that this issue percolated. There was an order from the trial court. There was some claim construction briefing mid-trial that resulted in the connected to construction that's on appeal. So the construction by the judge can refer not only to separate pieces that are later connected, but also to different parts of features that are discrete yet formed out of continuous-based material. Was that claim construction proffered by your friends, or was that just something that the district court judge came up with? That was language that was in the court summary judgment order that was parroted back during the trial phase, endorsed by Wonderland, and obviously opposed by Edenflow for the reasons we've laid out in our brief. When you say endorsed by Wonderland, was that their proposed construction, or was this just something that the district court came up with? The district court came up with the language, and then we filed trial briefs on it, and it was endorsed. Their briefing was, yes, we should construe it as Your Honor had proposed, that continuous-based material. On that issue, just I don't want to, if my colleagues have other questions, I don't want to belabor it, but that question seems to come down, and I think from the district court's jam-all too, to some of the language in the spec for the 951 patent that talks about the use as connected. I think he relied heavily, as your friends do, to the use of connected in another portion of the spec, dealing with Figure 1, where it was really one piece. Do you understand what I'm talking about? Yes, the headrest. How do you, I mean, I understand there's another embodiment that goes to this in Figure 2, where the pieces are clearly separate, two pieces connected to. But how do you get around the other language in the spec that uses the word connected for something that conforms seemingly with what the district court judge says? My response to that, Your Honor, would be threefold. The first is we're starting with the presumption that this claim that recites separate elements should be construed consistently with that. The trial court never made any effort to rebut that presumption in view of the intrinsic record. If you look at the claim language, the described embodiments of the pulling and connecting members of the driving device, they're always separate, Figure 2, Figure 4, Figure 6. So when we're actually talking about what the driving device is, including the amendment that was made during prosecution, it's clear that it's two structures. As to the headrest, I recognize that it looks like it's one piece, but it's the rest of that context in the statement. It's the ability to move synchronously. They're still two separate structures. They're just formed integrally. They're connected. But we still have a headrest and a body portion, two things that are connected so that they can move together when you adjust the backrest up and down. Well, the other thing that I didn't understand about the fact that that seems to be Claim 6 of the 951. And Claim 6 includes the language in the spec about formed, integrated, moving, whatever. But it doesn't use the word connected in the claim itself, in that claim. That's correct. That's my recollection, Your Honor. Could I ask you to move your argument over to the injunctive relief question? Yes, Your Honor. For context, Edenflow wasn't planning to address that, and we're fine resting on our briefs. But I'm happy to answer any questions that you may have. Why don't you address the 951 patent first with respect to the injunction? Well, Your Honor, I think the most basic point there, and that injunction was stayed by this Court on an emergency motion, was that relief was not requested by Wonderland as they conceded to the trial court at the hearing about it and granting relief that wasn't requested, obviously, runs a foul of due process. It was not briefed. There's no trial evidence about harms that may be suffered. With respect to the 951 patent, that is irreparable. In fact, the trial record shows that Wonderland doesn't even practice the patent. There seems to be some tension, and maybe it's just in my mind, about when you're looking at irreparable harm, you're looking at whether or not damages are quantifiable. That's one of the factors. But it seems on the other side of that equation, sometimes damages aren't quantifiable because they're way too speculative. So it seems like that's your deal. You're saying that the testimony, the evidence, was not sufficient? It wasn't sufficient? Taking what the witnesses say is true, the district court thought that that witness testimony put him over the line for irreparable harm. And I'm trying to understand your position, and your position is yes, they're all true, that's what they said, but even if you take what they said, that isn't sufficient to establish a case. So if that's the case, tell us why it's not sufficient. Yeah, I think there are two main— On the deferential standard of review. Absolutely. I mean, I think there are two primary responses to that. The first is that the alleged harm that occurred in this case is by Graco, a customer of Wonderland. Not an exclusive licensee, but just a customer. And the harms that it experiences are not the kind that we need to be personal to the patentee to award— Well, let's assume we reject that kind of global, black-letter law. I mean, if you can establish that certain harms would only inurt Graco and not to Wonderland, that's one thing. But if there's a one-to-one sales thing, if everything that Wonderland sells is Graco's product, then certain of the elements you're looking at would be the same. So why don't you leave that aside and tell us about— talk about the evidence and the insufficiency of the evidence in your view, even given the deferential standard of review. Absolutely. The Voto case would speak to that. But to your question, this was kind of a two-market theory presented at trial, where basically every sale by even flow of the infringing product takes a sale out of Graco's pocket. That is the most quantifiable type of harm that we can do. They lost a sale. We know what they make. We know what the royalty is. It's quantifiable. It's not irreparable. There's a suggestion, though, which would be a factor if there's sufficient evidence, that once you buy one Graco product, you buy another Graco product. And so there's an unquantifiable but clear harm going forward to the purchase, not just of these car seats, but to other products produced by Graco. Why was the testimony, in your view, not sufficient to establish that? There was testimony on the so-called ecosystem effect. It was unsubstantiated and uncorroborated by documentation. It was just, you know, the witnesses say so, but I recognize that it exists. Again, it just comes down to alleged lost sales, and lost sales are not the type of thing like tarnishment of name and brand that we consider irreparable. It can be made whole with a check. Okay. Do you want to save the remaining time for rebuttal? Absolutely. Okay.  Counsel, how do I pronounce your last name? Etienne Cummings, Your Honor. Etienne Cummings. Please proceed. Good morning, Your Honors. Shamita Etienne Cummings for Cross Appellant Wonderland Switzerland AG. I would like to reserve two minutes for rebuttal, please. Evenflo does present a lot of issues in their appeal. However, what they did not present is one or identify is one reversible error. Evenflo seeks to construe five claim terms across two patents, and for each of those five limitations, Evenflo seeks to relitigate facts on substantial evidence review. Evenflo further challenges the injunction, asking this Court to reweigh. Okay. Well, I think we know all that. Why don't you start, for me, one of the issues that I'm struggling a little bit with is the locking mechanism with regard to the four-in-one car seats, and in particular, where I believe the claim says, let's see, locking mechanism for selectively, detachably connecting the seat back to the seat assembly. So where is the locking mechanism for selectively, detachably connecting the seat back in the four-in-one system? What constitutes that locking mechanism? Thank you, Your Honor. What constitutes that locking mechanism is what Evenflo identified as the lock rod that sits on the seat back of the car seat for the four-in-one car seats. So that's just a rod, right? So that's just a rod. How does a rod selectively, detachably connect? I don't know how a rod does that. I understand how a latch, which reaches out and grabs the rod, does, but I don't understand how a rod does that. So without the rod, the seat assembly cannot be attached and detached, and there was testimony from... Okay, but if I think of a door, I mean, I'm just telling you what's bothering me about this case. If I think of a door, right, and there's a lock on the door, so you turn the thumb knob to lock the door, of course it's not going to lock unless there's a recess in the door frame. But the question is, which of those two things, the door or the door frame, has the portion that detachably locks or that you integrate? You know what I'm saying here. And so for me, it's the door that has the portion that locks because that's the part that turns. That's the part that does it. The frame is part of the locking mechanism because it's got a receptacle, but it's not the part that causes the locking. And that's where I'm running into trouble with the 4-in-1 car seats because all you have on the seat back is the rod, and the rod doesn't do anything except allow the thing to attach to it or not attach to it by just physically being there, and that feels like the receptacle in the door frame or the entry. So that doesn't feel like where the selectively detachable connecting portion is. It feels like what you connect to but not what does the connecting. For that, we should go back to the language of the claim where it says a locking mechanism for selectively detachable. So it is the lock rod that allows that selectable detachment to occur. It does not say a locking mechanism which selectively or that selectively makes the detachment or the attachment. Is this a 112.6 term? No, it is not, Your Honor. So a locking mechanism for selectively detaching, connecting is not a 112.6 term, but the 4 implies the function. You've got a structure, and then you've got the function. Because it's not a 112.6 term, that function isn't attributable. What we're saying is that without the lock rod, without the locking mechanism that is on the seat back, then the seat assembly cannot be attached or detached from the seat back. And there is testimony from Evenflo's engineers that confirm that. There is testimony from the experts that say without the lock rod, you cannot selectively attach or detach. Maybe I'm confused. Is the locking mechanism just the lock rod? It is part. The locking mechanism in totality is the lock rod plus the hooks that come over the lock rod. But the hooks, I think what the Chief was referring to in part, at least, was that the hooks aren't part of the seat back. And the claim term we're talking about, the limitation said, a seat back having a locking mechanism. It doesn't say a seat back that has the metal rod.  So that's the problem that at least I'm having. Right. So the locking mechanism includes the metal rod. So the metal rod is part of it. It includes, but it includes other stuff as well. That's my point. Right. And so if other parts of the locking mechanism are not in the seat back, how does that satisfy the claim limitation? Well, to have the entirety of the locking mechanism on the seat back would be not feasible because you're attaching two things together. And also we would be rewriting the claim. We would be saying that the seat back having the entirety of the locking mechanism. Well, wait. You're rewriting. It says the seat back having a locking mechanism. You are either saying it's the entirety or it's only part of the locking mechanism. You're rewriting the claim if you're saying that we should construe the limitation seat back having a locking mechanism to seat back having a portion of the locking mechanism. Right. I mean, do you get my question? Yes, Your Honor. Generally in claim construction, if we, there's not an absolute. If there's no absolute saying that the entirety or all of or only, those terms are not placed into the claim construction, then a portion or component or part of the locking mechanism being on the seat back is sufficient. That means that the seat back has a locking mechanism. Really? I mean, that's, if you say a seat back has a locking mechanism, we should construe that as a seat back having a portion of the locking mechanism. Is that what it comes down to? At least a portion of the locking mechanism, or as Judge Warren had. That's not what it says. We've seen a lot of claims that have language like that, at least a portion of. This says having a locking mechanism. I'm just trying to have you help me get around what I think the language is pretty clear on. It is very clear that the rod is part of the locking mechanism. There's no dispute that it is the entirety. And the district court had construed that as such, that it would be infeasible to require that the entirety of the locking mechanism be on the seat back during summary judgment and also as we were presenting evidence to the jury. So at no time during the course of this litigation was it required that the entirety of the locking mechanism be on the seat back. In fact, in the summary judgment, the lower court opined that it would not be feasible to read the claim in that way because you cannot lock two things together without having part of the locking mechanism be on one component and the other part being on another component to bring them together and to join. I think I understand your argument. I'm just not sure that you can get around my problem with it, which is I don't have a problem with the whole locking mechanism does not have to be on the seat back. But I think the portion that has to be on the seat back is what the claim says has to be there, which is the portion for selectively, detachably connecting. And that's the hooks. And so that's my problem with what you're arguing. I mean, I understand your argument. You've made the best argument you can on it. Do you want to maybe move on to some of your other issues? And if I did not agree with you on the 4-in-1 with regard to the 043, do you agree with your opposing counsel that the result then is for us to remand for the district court to figure out damages? Correct, Your Honor, because they have all the information to calculate the damages on that part. And if that's the case, wouldn't that – I mean, there might be other issues with the permanent injunction, but wouldn't that be a factor in the permanent injunction? Because the judge evaluated the whole universe, including 4-in-1 and 3-in-1. So any conclusions he drew with respect to market share and whatever, wouldn't that change the analysis in terms of a permanent injunction if we were to cut out all of 4-in-1? If you were to cut out all of 4-in-1, the analysis would be the same for the 951 as the court – Yeah, I'm not talking about the 951. I've already taken that off the table. I'm talking about the 043. For the 043, if it was remanded to determine blocking mechanism and infringement, then the court would have to reevaluate the injunction for the 043 also. Okay, so on the injunction, what specific testimony was there to establish that there was a kind of a product-to-product thing? Like once you bought one product, you're going to buy another product and another product and another product of the same seller. There was a testimony from the head of marketing, Ms. Carrie Zerlinski, that testified to the fact that the first choice that parents make is often a car seat, and there is brand affiliation with that, and so other products like swings and play pens are often combined with that, and there's no way of telling whether those sales of those other products that also Wonderland manufactures exclusively for Graco would be impacted. So this is more of a legal question. If there's no way of telling what the impact is, is that sufficient to establish irreparable injury? I mean, we have these two concepts about, yes, it's difficult to quantify, but on the other hand, it can't be completely speculative. Why isn't that in the speculative bucket, which is problematic for you? Because she did testify that, and she had market analysis, that there is a connection between, and she provided that evidence, that there is a connection between buying a car seat and then buying other products that also Graco sells that Wonderland is manufacturing. Can you give me a site and the spec for that analysis that tests the evidence and analysis, because I'm not sure I have it. One moment, Your Honor. I think it's JA 8 through 9. And J's, and more particularly that a car seat is the first purchase to spur other purchases for a baby. That's Joint Appendix 7 through 9. I can't find it now, but I will take a look, because I didn't see the specificity. What's the bottom line? What evidence did she have that someone who bought an Evenflo car seat would necessarily buy a high chair two years down the road? I think she cited two marketing surveys and analysis that Graco performed on how products are purchased together or decisions that she could link that when car seats were purchased, then other play pens, swing sets, other things that Wonderland does manufacture tie in with that. I don't remember seeing any of these marketing surveys that you're referring to, either testimony about them or the actual surveys. Do you know where they might be? I think the testimony was in Joint Appendix 7 through 10. Yeah, that's the testimony. That's just court opinion. So where can I actually see the testimony? I'll have to... Okay, well, can your co-counsel look at it? So it may be Joint Appendix 6310 to 12. 6310? 6310? Okay, if your co-counsel could look for it. I'm sorry, Joint Appendix 4973 also. But there were marketing surveys? She spoke of marketing surveys. I'm not sure that she submitted those marketing surveys. She testified to that. So somewhere in their testimony is her basing her conclusion of lost convoy sales on marketing surveys.  Okay.  Can I ask you to pivot to your cross-appeal willfulness? Yes, Your Honor. I am, yes, Your Honor. Go for it. Tell me about your cross-appeal. What we are saying is that the judge erred because he only looked at the actual knowledge and weighed the probative value and the prejudicial effect on actual knowledge. He did not weigh the probative value and the actual effect on the intent to infringe. So because there was a stipulation of actual knowledge, any prejudice would outweigh probative value. However, a more fulsome analysis should have been done on what is the prejudicial effect versus the probative value of a long string of e-mails, as Your Honor identified. And for that reason, we … When you look at the court's opinion at 40308, the page 8 of the opinion, isn't that enough of an analysis by the court? I don't believe so because in their opinion, he's weighing that prejudicial value toward the intent. I'm sorry, toward the actual knowledge of the patent. That's going to be different if you're looking at what is the probative value to show the intent of infringement. I think I'm out of time, Your Honor, so … versus the potential risk that's involved in the prejudicial risk in admitting the e-mail. But he was only looking at it to, if there was any prejudice, to prove that the parties knew about or even Flo knew about the patent. We had already stipulated that even Flo knew about the patent. What he didn't weigh was the prejudicial risk against the probative value to show intent, to show the long e-mail, to show the people that were on there, to show the timing of the e-mail, to show what they did or did not do. Let me ask you something very specific. Did he analyze … So there's a discussion that he gives about how this e-mail goes to future products, which are not an issue in the suit, and that might be confusing to people, okay? Did he analyze the fact that the e-mail expressly mentions the even Flo Evolve product might also involve this, and could you advise how to avoid infringement ingeniously? You know, so I don't remember him addressing the fact that this e-mail, in fact, identifies one of the five products at issue in this case. One of the two patents at issue in this case suggests infringement of the product by the patent at issue in this case and asks how we can basically redesign it to avoid infringement. That's what I thought personally I saw as being missing from his analysis. How is that prejudicial or not probative or whatever? No, I agree with you, Your Honor. That is very probative to show the intent not to infringe or the intent to infringe, and he didn't analyze that against showing the intent to infringe, as you've just outlined, Your Honor. Go ahead. Let me ask one more question. At the motion in limine, didn't y'all offer that the e-mails could be redacted as necessary? He could give a limiting instruction to address the concerns that there were many ways, you know, to narrow which portion of this e-mail would, in fact, have been presented to the jury. I assume the part you really want is the part that says we're worried about the Evenflo Evolve seat infringing the 043 patent. I assume that's the little nugget that you really wanted the jury to see that, you know, that was expressly articulated. Is that fair? That's fair, Your Honor, and also to see that there was a long set of e-mails of discussion even before it got to that point. While they were developing the infringing product and the feature. So there's another. But we don't have evidence that he found, and I don't have any reason to doubt it, or you haven't convinced me, that most of this e-mail chain is to the design of a product that wasn't one of the products accused of infringement. But if there's another line in there that does talk about the arms, the attachment arms, or what we're calling the attachment arms, and so there's a feature that can still be used in future products, and we wanted to show the jury that they did not do anything to address that one feature. Okay. I'm a little confused, and I'm sure you know the record better than I, but I think like the chief, I mean, there are a few nuggets. There's at least one nugget in here. But was this fight about that e-mail, or was it kind of an all or nothing that you were having, I mean, the appendix seems to have like 50 pages or 30 pages of e-mails. And when he was saying this is confusing and yada, yada, yada, I could see that being the comment with respect to the entirety of the e-mail chain. So was it because you were fighting the wrong fight? Was the fight only about can we put this whole chain of e-mails and not just with respect to the one e-mail, which I think there's concern about? No, Your Honor. To be clear, the crux of the fight was really to have what Judge Moore outlined in that one e-mail that pinpointed, that showed the patent, that showed the claim of the patent, and made the one statement underneath that. So we're really talking about that one section is really the crux of the patent. And you made a separate argument with respect to that section? Yes, we did, Your Honor. Did you ever renew your motion right before trial or during trial? I mean, the court does say that at appendix 4008, it says, however, if during either false presentation of evidence or testimony, evidence is developed which potentially changes the result, the court will reconsider its ruling. Did you ever ask it to reconsider its ruling? Yes, we did, Your Honor. It was during the examination, I believe, of one of even Flo's witnesses when we did renew that we would like to bring in the Dracula Project e-mail, and that was denied. Wouldn't this action taken by the court indicate that it took a rather reasoned approach to this issue? I think the court was still looking at just one prong of willfulness in its approach, and it was reasoned in that one prong to determine that there was knowledge, but the court really did not weigh or articulate to us that he weighed the evidence on the intent to infringe and how the probative value of that e-mail to the intent to infringe. Okay. Thank you, counsel. Thank you, Your Honor. We're going to hear from Mr. Henkel. Mr. Henkel, she went over by five minutes, so if you need extra time, we will certainly extend the amount of time you have left. Why don't you just put eight minutes on his clock? You don't have to use all eight minutes, Mr. Henkel, but we're going to give you eight minutes on your clock. I understand brevity is important here, and I appreciate the accommodation. You want to start with willfulness? Do you mind starting with willfulness? I can absolutely start with willfulness. I also have a citation on the testimony about the loss of sales of other products, if it's helpful. But, yeah, we can start with the willfulness question. I think the district court did not consider this issue in a vacuum of an e-mail. This was a motion to eliminate about the subject matter generally, and he went through and poured through deposition designations, related testimony. The author of this e-mail was never to post. The e-mail goes out to folks. They're asked about it. They don't know. So all those objections. I don't understand. So, number one, he said something about this might be privileged. Well, you all disclosed it. You never tried to call it back. To this day, you haven't tried to call it back. So the privilege idea is out the window. That can't justify anything at all. Then there's something about hearsay, but they're not offering it for the truth of the matter asserted. They're offering it for the fact that you all didn't do anything, even though somebody brought to your attention the patent, the exact claim limitation, and your exact product accused of infringement in this one little narrow e-mail. And so I don't see how hearsay is at all applicable here. So all I'm left with is prejudice versus probative value. And to the extent that in the motion in Limine, they did specifically argue to him that if he had any concerns, they were fine with redactions, with cautionary instructions to the jury, all of that. How? Why do we defer? I mean, I'll be honest. This is like a smoking gun in willfulness. You've got an e-mail that alerts your company to the exact product accused of infringement, infringing the exact claims at issue of the exact patent, and even identifying the claim terms. I mean, we don't often see a smoking gun in patent cases, but this feels like a smoking gun. I don't see how something could be more probative than this. Now, I understand the whole e-mail, but it seems like they offered a lot of solutions in terms of redactions or cautionary instructions. I don't see how you keep this sentence out. Your Honor, with due respect, I disagree. There was stipulation in the case. Witnesses were asked. They knew about the 043 patent as early as 2014. They had reviewed and seen Claim 1 of the 043 patent as early as 2014. But that's knowledge. Correct. There's two portions of willfulness. There is knowledge of the patent, which everyone is stipulated to. That's not the issue. And the second issue is intentionality. Did you knowingly take steps that amounted to infringement, that you knew these were going to be infringement? And here, that's the hardest thing to prove in willfulness. It's not knowledge of the patent. That's never the hard thing to prove. The hard thing to prove is that the steps that they took, they knew, would potentially be infringing, and that's what this e-mail is sort of a smoking gun evidence of. Well, in fairness, Your Honor, my response to that would be to, The court weighed this evidence in the totality of the testimony from everyone that was deposed. And there was a slew of deposition designations. Our objections were sustained in connection with testimony about this e-mail. The author of the e-mail was never deposed. We do not know precisely what she meant. One of the big reasons for the prejudicial effect outweighing the probative value of this e-mail is the clear and obvious language barriers that exist between I don't see. It's in English. I don't see. I don't even see a grammatical flaw in the portion of the e-mail that they want admitted. I mean, I don't understand what. I mean, I guess she abbreviated the word please by PLS, but that seems pretty LOL to me. You know, so I'm not really sure what. I don't understand. They're not trying to. I mean, yeah, there's some stuff that looks like it's in, I guess, maybe Chinese. I'm not even sure what language. But that's not the part that they care about. I think they're fine with redacting the Chinese. Are you fine with redacting the Chinese? Yes, Your Honor. Okay. Thank you. Your Honor, there is, I think, an apparent language barrier. There's a reference to the claim requiring locking of booster seat lower section two tubes. That is not a reference to claim one of the 043 patent. Potentially, it's a reference to the Chinese equivalent or the language that's used in that patent, but this was a weighing factor that the trial court did, and they found that the prejudicial effect of the language barrier alone is a contributing factor that warrants exclusion. I would also like to return to the privilege issue Your Honor had mentioned. You say that overall that the email is speculative. I mean, it uses the words like it might fall under, fall under, below. I don't know what that means. It says it could also find that then a product is named might also involve this, and I don't know what that means. Where can you point in the record to show us that the court thought its way through all of this, the email? Appendix 4008, that's the district court's order granting the motion to eliminate. I think that's that part of that I read before. Yes, Your Honor, and it also came up in the context of Jamal when they did move for a new trial. I don't have that precise citation. Maybe my colleague can grab it, but they renewed this argument, and it was again rejected for many of the same reasons that are listed in the motion, the court's order on the motion to eliminate. And you heard me ask before whether there was a follow-up on the motion to exclude. Prior to trial, and did that happen right immediately prior to trial or during the trial itself? Your Honor, my recollection is that it happened during trial, and it was basically an even flow opened the door, let the Dracula email come in, and the court disagreed. So the court didn't slam shut the decision on the parties. It allowed the parties and also the case to evolve and reconsider the, potentially reconsider the decision.  If even flow offered or provided testimony that in any way ensnared the relevancy or changed the court's calculus, Wunderlin was, of course, free to revisit the issue. I do want to address some of the merits arguments, but I do want to return real quickly to privilege. It's Appendix 3785. This is the response to the email. They're asking to send the... Appendix 375 or 3785? 3785. It's the first page of the email where they're asking to send the lawyer letter to the author of the original email. We're not saying this email is privilege, but 298, there is a lawyer letter, and we have not waived our privilege on that. And suggesting to the jury that this letter exists without us being able to is highly prejudicial. And so I do think there's a clear privilege issue. Well, you don't have to turn the lawyer letter over. Nobody said that. And they expressly... I remember this discussion in particular in the motion in Lemonet where they made it clear to the judge that that could be redacted and they'd be okay with that in its entirety so that it wouldn't even... the jury would never even know that there was a lawyer letter that they're not getting to see. But the context of the original request is a request for that lawyer letter. She doesn't use that language, but that is clear from the contemporaneous response to her email that she's asking basically how... tell us what our design strategies were or whatever. What's in the lawyer letter? Pass it along. That is a request. And, you know, on the balancing scale, the court weighed the issue and found that it tended to be more prejudicial than it is probative, and that's the trial court's prerogative with an abuse of discretion. Okay. You were going to give us a citation to the record on the PI. Oh, yes. Of course. I have it, and I will defer to my colleague. But I have it as Appendix 5674. This is the direct testimony of Renee Wong. She is the corporate representative. But she was referring to another witness, some other. She was talking about some other witness testimony. I believe she was talking about a Graco employee, Ms. Berzlecki. Berzlecki, yes. If I mispronounced that. This is the citation of which I'm aware of. There's a blank question, have you lost sales of other trial products? How do you know that? She says no more than parents will buy other products under the same brand, so maybe they make difficult decisions. And she goes on. So it's anecdotal. It's not backed up. And what's the citation on that? Appendix 5674. That's trial page 584, 13 through 25. So just to be clear, opposing counsel represented to us that one of the witnesses testified about lost sales with reference to marketing surveys. The surveys may not have been introduced, but she claimed the testimony clearly referenced the fact of surveys. Is that accurate? I looked. I'm not in a position to confirm or deny that. I trust her candor to the court. I like the way that you handled all of that. Thank you. Is there anything else you want to add? Because we didn't really give you a chance. We kind of dove in. And we're going to give her two minutes on rebuttal that she asked for. So if there's anything else you want to say, we're happy to hear it. Yes, there is one point on the merits side that I was hoping to just impress. We have obviously briefed up why we think the engagement term should have been construed a claimed construction. We were told it would at summary judgment, but that didn't happen. We believe it should be construed. And under that construction, you can reverse the judgment. But to focus on what the jury actually found, there's a doctrine of equivalence infringement issue on the 043. We would urge the court to consider the argument that we outlined on Dr. Cameron's DOE opinions. One thing, I mean, this is rebuttal. And she does not get to respond to your case in chief. On her rebuttal, she only gets to respond to willfulness. So you have to contain yourself to the issues you raised in your opening argument. It's not fair. For example, engagement, you didn't talk about that in your opening argument, so she didn't talk about it. So it's not fair for you to use your rebuttal because she doesn't get to respond to new stuff. But anything that we talked about already, like the 4-1 or the locking mechanism, anything that we've already talked about that you want to discuss is fair game for now because I'm going to hold her to the same standards, right? No, Your Honor. If that's the rules of the game, then I don't have anything further. I appreciate the court's time. Thank you so much, counsel. I defer her two minutes of rebuttal, which will be limited, obviously, to the cross-appeal issue, which is willfulness. Thank you, Your Honors. The site, thank you for the site, counsel, for Mrs. Wong's testimony. She's the CEO. And the site is Appendix 4973 from Carrie Straczynski's testimony, and Your Honor is correct that there weren't surveys submitted, but she did testify to her knowledge in the marketing area. There was, as the email indicated, that Evenflo knew that there was a specific infringement problem and that Evenflo took no action. And that's exactly what the email indicated in two of the emails, the side-by-side of those emails. So, therefore, we ask that the court reverse that finding so that the district court can look at and weigh the probative value and the prejudicial effect of the email as it pertains to intent. Otherwise, we rest on our briefs for all of the arguments. Thank you, Your Honor. Okay. I thank both counsel. This case is taken under submission.